UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD BARLING,<br><br>    Plaintiff,<br><br>    v.<br><br>UEBT RETIREE HEALTH PLAN, et al.,<br><br>    Defendants. | Case No. 14-cv-04530-VC<br><br>**AMENDED ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 32, 37 |

Introduction

Harold Barling has sued the UEBT Retiree Health Plan (which is an ERISA plan) and related defendants. He contends the defendants violated the terms of the ERISA plan by requiring him to pay deductibles and coinsurance during a time when Medicare served as Barling's "primary payer" and the Plan served as his "secondary payer." He brings this claim on behalf of himself and others similarly situated.

Barling also seeks ERISA penalties for the plan administrator's failure to respond promptly to his document requests. He brings this claim only on his own behalf.

The parties have agreed that the Court should consider cross-motions for summary judgment on both claims before entertaining a motion for class certification on the first one. With respect to the first claim, Barling's motion is granted and the defendants' cross motion is denied. With respect to the second claim, Barling's motion is granted and the defendants' cross-motion is denied.[1]

---

[1] This is an amended version of an order filed July 31, 2015. The previous version concluded, with respect to the first claim, that Barling lacked standing to represent prospective class members who were required to pay coinsurance but not deductibles. The Court has reconsidered that issue *sua sponte*, and now concludes that Barling may represent prospective class members who were required to pay either deductibles or coinsurance during the class period. This order is the same as the previous version in all other respects.

United States District Court
Northern District of California

The Benefits Claim

The Plan provides health benefits to certain retirees who are members of the United Food and Commercial Workers Union. When the retirees don't have other health insurance, the Plan serves as the "primary payer" of health benefits. When the retirees do have other health insurance (most commonly Medicare), the Plan serves as the "secondary payer" of health benefits.

Barling retired and used the Plan as his primary payer for a time. But when he turned 65 he enrolled in Medicare, which caused the Plan to become his secondary payer. He contends that when the Plan first began serving as his secondary payer, it did not require him to pay any deductibles or coinsurance. But in 2011, Barling contends, the plan administrator started requiring him and other retirees to pay deductibles and co-insurance. He argues that this was contrary to the plain language of the Summary Plan Description ("SPD"), at least until that language was changed in 2013.[2]

Barling is correct that under the plain language of the SPD, the retirees cannot be forced to pay coinsurance when the Plan serves as the secondary payer. *See Harlick v. Blue Shield of California*, 686 F.3d 699, 708 (9th Cir. 2012) ("We look first to the explicit language of the agreement to determine, if possible, the clear intent of the parties . . . ." (internal quotation omitted)). This interpretation involves two simple steps.

First, coinsurance is part of the Plan's "Covered Expenses." As the SPD explains, "[c]oinsurance is a percentage of the Covered Expenses that you pay." The SPD provides that the retiree may be required to pay a set percentage of the "Covered Expense" as "coinsurance." For example, for diagnostic labs and X-rays, the retiree must pay 25% of the "Covered Expenses" and the Plan will pay 75% of the "Covered Expenses."

Second, the SPD states that when the Plan serves as the secondary payer, it pays for all "Covered Expenses," without requiring the retiree to pay a "percentage" of them. Specifically, the SPD contains a section titled "How Much This Fund Pays When It Is Secondary." The first sentence of this section states: "When this Fund pays second, it will pay 100% of Covered

---

[2] The parties agree that in this case and for the pertinent time period, the SPD supplies the actual plan language, because no formal plan document exists.

2

Expenses less whatever payments were actually made by the Plan (or Plans) that paid first." This language does not leave room for the Plan to make retirees pay some percentage of "Covered Expenses" when the Plan is the secondary payer.

The defendants argue that the clear language discussed above is rendered ambiguous by the next sentence (that is, the second sentence in the section titled "How Much This Fund Pays When It Is Secondary"). That sentence reads: "In addition, when this Fund pays second, it will never pay more in benefits than it would have paid had it been the Plan that paid first." The defendants argue that this sentence should be interpreted to mean that since the Plan does not cover coinsurance when it serves as the primary payer, it would be paying "more in benefits" if it were required to cover coinsurance when it serves as the secondary payer. But a far more natural interpretation of this sentence is that the Plan is protecting itself from ever being required to pay more *in total* than the amount it would be required to pay as the primary payer. If the drafters of the SPD intended what the defendants are now urging, they could easily have said so in terms that are far clearer. For example, they could have said: "When this Fund pays second, it will pay the same percentage of Covered Expenses that it ordinarily pays, less whatever payments were made by the Plan that paid first." This would have made clear that the Plan could require retirees to pay coinsurance when the Plan serves as the secondary payer. Instead, the drafters of the SPD said that the Plan "will pay 100% of Covered Expenses." And "Covered Expenses" indisputably includes coinsurance. No reasonable layperson could read this language and conclude otherwise. *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) ("[T]erms in an ERISA plan should be interpreted in an ordinary and popular sense as would a [person] of average intelligence and experience." (internal quotation omitted)).

A similar analysis applies to deductibles. Just as coinsurance is part of "Covered Expenses" within the meaning of the SPD, so too is the deductible. In pertinent part, the SPD defines a "Covered Expense" as "the expense which you may incur for Covered Services [so long as that expense is] the lesser of the actual fee charged [by the health care provider], the applicable negotiated fee allowance [for the provider], or the Allowable Charges." And "Allowable Charges" are charges that are medically necessary and reasonable, as determined by the Plan. In other

words, the "Covered Expense" (i.e., the expense "you may incur") is based on the amount charged by the provider for the Covered Service.  In turn, the SPD explains that the "deductible" is "the amount of expenses (usually a specific dollar amount) that must be paid by the Retiree before the Trust Fund begins paying any expenses."  When a retiree pays a deductible, he is paying part of the amount charged by the provider for the service, and therefore he is paying part of the "Covered Expense" for the service.

The defendants argue that the "deductible is plainly independent of Covered Expenses." But there is no support for this assertion in the language of the SPD.  In fact, the defendants' assertion makes no sense given how the Plan operates.  Consider the following hypothetical. Suppose in January a retiree gets his first medical treatment of the plan year – a procedure for which the doctor charges $1,000.  Suppose this $1,000 charge is a "Covered Expense" because it's the "lesser of" the "actual fee charged" and the "applicable negotiated fee allowance," and because the procedure is medically necessary. (This is all that's needed for a doctor's charge to fall within the SPD's definition of a "Covered Expense.")  In that circumstance, under the terms of the SPD, the retiree must pay a $400 deductible towards the $1,000 expense before the Plan will pay anything.  And then with respect to the remaining $600, the retiree pays his coinsurance portion (say, $150) and the Plan pays its portion (say, $450).  All those payments – the $400 deductible payment, the $150 coinsurance payment, and the $450 payment by the Plan – go towards paying the $1,000 "Covered Expense."  And the SPD specifies that when the Plan serves as the secondary payer, it pays "100% of Covered Expenses" (minus whatever was covered by the primary payer). So the Plan could not, consistent with the SPD's language, have required retirees to pay deductibles when it served as the secondary payer.  The defendants have pointed to no language in the SPD, and made no argument, for how the $400 deductible payment in this example could be excluded from the "Covered Expense" given how the SPD defines "Covered Expense."

Because the language discussed above is susceptible to only one meaning (namely, that coinsurance and deductibles are part of "Covered Expenses" and therefore the Plan could not make retirees pay them when the Plan serves as the secondary payer), there's no need to consider extrinsic evidence.  *See Harlick*, 686 F.3d at 708 ("We look first to the explicit language of the

4

1  agreement to determine, if possible, the clear intent of the parties, and then to extrinsic evidence."

2  (internal quotation omitted)). Nor, in any event, do the extra-contractual materials submitted by

3  the parties cause the SPD's clear language to somehow become ambiguous.

4      In addition, there's no need to consider whether the Plan's decision to require Barling to

5  pay portions of his deductibles should be reviewed de novo or for abuse of discretion. Under

6  either standard, Barling would win. *See Tapley v. Locals 302 & 612 of Int'l Union of Operating*

7  *Engineers-Employers Const. Indus. Ret. Plan*, 728 F.3d 1134, 1140 (9th Cir. 2013) ("The Trustees

8  abuse their discretion where they 'construe provisions of [a] plan in a way that clearly conflicts

9  with the plain language' of the Plan . . . ." (citation omitted)). In any event, it appears the Plan

10  never exercised its discretion to engage in the interpretive task required by this case, because it

11  misunderstood Barling's claim, and then denied his appeal with a one-sentence explanation that

12  was nothing more than word salad. Or as Barling's counsel aptly puts it, "a single sentence of

13  relevant-sounding words strung together but yielding no meaning." The sentence reads: "The

14  Appeals Committee has denied this appeal for request for payment for allowed expense applied to

15  the annual deductible coordination of benefits."[3]

16      This discussion mandates a grant of summary judgment for Barling on his claim for

17  benefits, and denial of the defendants' cross-motion for summary judgment. Because the Plan

18  improperly required Barling to pay deductibles during a period leading up to March 1, 2013 (at

19  which point the Plan changed), he is entitled to a refund of that money.[4]

---

[3] And now, in court, the defendants insist on an interpretation of the SPD that is contradicted by its plain language. Because the Plan has already determined that Barling incurred $220.47 in out-of-pocket liability for deductibles, there's no reason to remand the case to the Plan for further consideration. *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460-61 (9th Cir. 1996) (remand is appropriate where there are remaining factual determinations).

[4] The defendants argue that Barling lacks standing to pursue a claim (on behalf of himself or the prospective class members) based on the requirement that plan participants pay coinsurance, because Barling himself was never required to pay coinsurance during the relevant period. However, the injury from the requirement to pay coinsurance is substantially similar to the injury from the requirement to pay deductibles (with both coinsurance and deductibles being "Covered Expenses"), so Barling may proceed as a named plaintiff representing prospective class members who suffered either type of injury. *See, e.g., Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015); *Garrison v. Whole Foods Mkt. Grp., Inc.*, 2014 WL 2451290, at *4 (N.D. Cal. June 2,

United States District Court
Northern District of California

The Claim for ERISA Penalties

Barling also seeks statutory penalties for the Plan's failure to timely provide certain documents: (i) the Summary Plan Description; (ii) the Trust agreement; (iii) the Collective Bargaining Agreement; (iv) the Amended and Restated Limited Liability Company Agreement for the UFCW – Employers Benefit Plans of Northern California Group Administration, LLC; and (v) the contract between the Plan and the UFCW– Employers Benefit Plans of Northern California Group Administration, LLC.  ERISA requires that an administrator furnish the documents sought here within 30 days, 29 U.S.C. §§ 1024(b)(4); 1132(c), and the Plan admits that it didn't provide the documents within this timeframe.

Awarding statutory penalties is discretionary. 29 U.S.C. § 1132(c). In making an award, the Court is to consider any bad faith or intentional misconduct by the administrator, the length of delay, the number of requests made and the extent and importance of the documents withheld, and any prejudice to the participant. *See Moon v. Rush,* 2014 WL 7336227, at *8 (E.D. Cal. Dec. 22, 2014) (citing *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002)). The Court finds the following:

1. <u>Summary Plan Description</u>:  The Plan received a request from Barling for the Summary Plan Description on October 2, 2013, and the Plan sent him the document 71 days later, on December 11, 2013.  The Plan had previously mailed Barling a copy of the SPD in April 2011 and again in August 2011.  Assuming the Plan violated the statute by not promptly sending Barling the document again, statutory penalties are not warranted.  Barling was not prejudiced by the delay.  He had the SPD at the time of his appeal in 2011 (he quoted the Plan in his appeal), and it did not impact his ability to bring or prosecute this lawsuit.  The delay was relatively short, and there's no evidence of bad faith.

2. <u>Trust Agreement</u>:  The Plan also received a request from Barling for the Trust agreement on October 2, 2013.  The Plan sent him a copy 72 days later, on December 12, 2013.  Again,

---

2014).

6

statutory penalties are not warranted for this violation because the delay was relatively short, there is no evidence of bad faith, and there's no indication Barling was prejudiced by the delay.

   3. <u>Collective Bargaining Agreement</u>:  The Plan also received a request from Barling for the Collective Bargaining Agreement on October 2, 2013.  But Barling did not get a copy until April 17, 2013, 198 days later and only after the Department of Labor sent the Plan a letter directing it to produce the document.  ERISA expressly requires the Plan to produce the latest "bargaining agreement," and does not require that it be relevant to an appeal.  29 U.S.C. § 1024(b)(4).  Because this delay was excessive and it took many requests from Barling's counsel and a letter from the Department of Labor before the Plan produced the document, penalties are warranted.  Barling is awarded $5,000.

   4. <u>LLC Agreement and Contract</u>:  Barling also requested copies of the Amended and Restated Limited Liability Company Agreement for the UFCW – Employers Benefit Plans of Northern California Group Administration, LLC, and the contract between the Plan and the UFCW– Employers Benefit Plans of Northern California Group Administration, LLC.  The Plan received his request on January 2, 2014, but Barling didn't get copies of these documents until February 20, 2015.  As "contracts" or "other instruments under which the plan is established or operated," these documents fall within the scope of the statute.  29 U.S.C. § 1024(b)(4).  Again, the statute does not require that the document be relevant to his appeal.  Because this year-long delay was excessive, and the Plan only produced the documents after Barling obtained counsel and filed this lawsuit, penalties are warranted.  Barling is awarded $5,000.

   Conclusion

   With respect to the first claim, Barling's motion is granted and the defendants' motion denied.  The defendants must refund Barling for the money he spent on deductibles before March 2013.

   With respect to the second claim, Barling's motion is granted and the defendants' motion is denied.  The defendants are ordered to pay Barling $10,000 in statutory penalties.

**IT IS SO ORDERED.**

Dated: February 19, 2016

_____
VINCE CHHABRIA
United States District Judge